Elizabeth
**COLEMAN–SANTUCCI, Plaintiff,**

v.

**SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.**

Civ. No. 80–2893.

United States District Court,
District of Columbia.

Jan. 7, 1991.

Joel P. Bennett, Washington, D.C., for plaintiff.

Marina Utgoff Braswell, Asst. U.S. Atty., Elizabeth Jordan Gianturco, Office of the Gen. Counsel, U.S. Dept. of Health and Human Services, Washington, D.C., for defendant.

## MEMORANDUM

### JUNE L. GREEN, District Judge.

Plaintiff Elizabeth Coleman–Santucci[1] brought an action under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act (ADEA) alleging age and sex discrimination by the defendant. On March 31, 1982, this Court issued a judgment in favor of the plaintiff. Order and Judgment, dated March 31, 1982. The Court found that the Department of Health and Human Services (HHS) had discriminated against Ms. Coleman–Santucci on the basis of sex and age in failing to promote her to a GM–14 level. Memorandum Opinion, dated March 31, 1982. This Court ordered HHS to promote the plaintiff to a GM–14 position when one became available.

On June 10, 1982, the Court amended its earlier judgment to include an injunction prohibiting HHS from committing any future retaliatory acts against the plaintiff.

The Court has reopened this case to determine whether or not the defendant has subjected the plaintiff to retaliatory acts of discrimination in violation of this Court's 1982 judgment. Upon consideration of the testimony presented during the reopened trial, both parties' proposed facts and findings, the entire record and for the reasons set forth below, this Court finds that the defendant retaliated against the plaintiff in failing to appoint Mrs. Coleman–Santucci as Acting Director of the Division of Agency Operations and Management upon the retirement of Mr. John Belin. The Court further finds that the plaintiff failed to show any other retaliatory acts by the defendant, and failed to establish that she was entitled to a grade 15 promotion. The Court, therefore, denies further relief to the plaintiff, Mrs. Coleman–Santucci.

### I. *Plaintiff's Claims*

The plaintiff claims that since this Court's Judgment in 1982, the defendant has engaged in acts of discrimination in reprisal against her. Specifically, Mrs. Coleman–Santucci alleges five acts of discrimination.[2] First, the plaintiff alleges that the defendant refused to appoint her as the Acting Director of the Division of Agency Operations and Management ("DAOM") when then-Director of DAOM, John Belin, retired in January of 1986. Second, the plaintiff alleges that in March of 1986, a Task Force which she headed was denied a group award. Third, Mrs. Coleman–Santucci alleges that the defendant denied her the opportunity to lead an interdivisional team and denied her a temporary promotion in connection with the project. Fourth, the plaintiff alleges that her September 16, 1986 performance rating of "Excellent", rather than "Outstanding",

---

1. At the time the plaintiff filed her Title VII action her name was Elizabeth Coleman.

2. In her Proposed Findings of Facts and Conclusions of Law, the plaintiff sets forth six allegations of discriminatory actions by the defendant. The plaintiff's second allegation describes certain statements made by Dr. Florence Fiori. During the administrative review process, the plaintiff's second allegation was treated as background material to the plaintiff's remaining allegations. The defendant also has treated this allegation as an evidentiary point. The Court finds that the plaintiff's second allegation is not a separate allegation of reprisal. Rather, it will be treated as evidentiary support for the remaining five allegations.

was discriminatory because the defendant used inappropriate weightings of performance elements. Fifth, the plaintiff alleges that on September 28, 1986, she was assigned as Deputy Branch Chief to the Health Standards Branch, Division of Associated and Dental Health, Bureau of Health Professions. She alleges that this assignment was retaliatory because she was made a supervisor in a branch with no personnel and no program mandate.

## II. *Factual Background*

### A. Selection of Acting Director of DAOM

Mrs. Coleman–Santucci testified at trial that as a result of this Court's judgment in 1982, she was awarded a GM–14 position as Acting Director of DAOM.[3] In December 1985, Mr. John Belin, Division Director of DAOM, announced his retirement. The plaintiff had been told that upon Mr. Belin's retirement she would be made Acting Director. However, the day before Mr. Belin was to retire Dr. Florence Fiori, the Associate Bureau Director of the Office of Health Planning ("OHP"), informed Mrs. Coleman–Santucci that Mr. John Heyob had been selected to serve as Acting Director.

The plaintiff testified that she was perplexed by this choice. Mr. Heyob was, at the time, the Deputy Director of OHP. His appointment as Acting Director of DAOM meant he would be serving in both capacities at the same time. In addition, Mrs. Coleman–Santucci knew that Mr. Heyob was reluctant to accept the position. At trial, Mr. Heyob testified that he agreed to serve as Acting Director only because Dr. Fiori urged him to do so. The plaintiff further testified that when she asked Dr. Fiori for an explanation, Dr. Fiori responded, "Liz, why did you want to come back to planning? Didn't you know they'd be out to get you?"

Dr. Fiori denied posing these questions. She also denied that her decision to make John Heyob, rather than Mrs. Coleman–

Santucci, the Acting Director of DAOM was made with retaliatory intent. Dr. Fiori testified that both Mr. Belin and Mr. Heyob had recommended against selecting Mrs. Coleman–Santucci for the position. Both Mr. Belin and Mr. Heyob felt that the selection of the plaintiff would be disruptive and create stress within the office.

Witnesses for both parties testified that there was much unrest in the Office of Health Planning at the time of the selection of Acting Director. The program was being threatened with closure. Dr. Fiori testified that she did not want to add to the stress of the employees in the program by selecting the plaintiff to serve as Acting Director during this crucial period.

In addition, Dr. Fiori testified that she was worried about an appearance of preselection in choosing an Acting Director. The Acting Director would run the division until a permanent director could be chosen. Dr. Fiori had announced that the permanent position of Director of DAOM would be advertised and eligible employees could compete for the position. Dr. Fiori consulted Dr. Donald Parks, the executive officer responsible for personnel matters. Dr. Parks advised her that selecting the plaintiff as Acting Director might create the appearance of preselection as Mrs. Coleman–Santucci would be a candidate for the Director's position. Dr. Parks recommended that Dr. Fiori select Mr. Heyob. Mr. Heyob would not be competing for the job because it did not involve a promotion for him; therefore, no charge of preselection could be raised. Furthermore, as the Deputy Director of the office, Mr. Heyob was qualified for the job, and he worked well with the employees in the division.

Based on the information and recommendations she received, Dr. Fiori selected Mr. Heyob to serve as Acting Director of DAOM. She wrote a memorandum to the staff in the division informing them of her selection. In the letter, Dr. Fiori explained that her choice of Mr. Heyob would ensure

---

**3.** At that time DAOM was known as the Division of Planning, Assistance and Assessment, or "DPAA".

that the process of selecting a permanent Director would be fair and open. In February 1986, Dr. Fiori was informed that the permanent position of Director could not be filled because the program was to be phased out.

### B. Section 1122 Task Force Group Award

In January of 1986, the Section 1122 Task Force which the plaintiff chaired was nominated for an outstanding group performance award. Both Dr. Fiori and Dr. Daniel Whiteside, the Bureau Director, approved the award nomination. However, the Awards Committee did not make an award to the Section 1122 Task Force. Nancy Corliss, who served at the Executive Secretary of the Awards Board in 1986, testified that the awards were scored anonymously by each member of the Committee and sent to Ms. Corliss. Ms. Corliss then ranked the nominees according to the cumulative scores. In a meeting of the Board, the Committee members determined how many awards would be given out and made awards to the top-ranked nominees. The Board's bylaws prohibited discussion of individual members of any group nominated for an award.

In 1986, when the Section 1122 Task Force was nominated, the Awards Committee made awards to the top six-ranked nominees. The plaintiff's group was ranked nineteenth out of twenty-one by the Committee.

### C. Interdivisional Team

In July 1986, the plaintiff was approached by Dr. Fiori, Mr. Heyob and Mr. James Mahoney and asked to head an interdivisional team which would focus on Section 1122 and Certificate of Need (CON) issues. Mr. Mahoney had been appointed recently as the Director of the Division of Analysis and Assistance in the OHP. His experience in the health planning area was minimal and he needed someone to provide technical assistance. He was impressed with Mrs. Coleman–Santucci's knowledge of the Section 1122 and CON programs. Mr. Mahoney thought that the plaintiff could be very helpful leading the interdivisional team. Dr. Fiori and Mr. Heyob concurred in Mr. Mahoney's judgment.

At a meeting on July 5, 1986, Dr. Fiori, Mr. Heyob and Mr. Mahoney presented their proposal to the plaintiff and asked her to consider it, along with any suggestions she might make for developing the team. The plaintiff came back to them with two suggestions. First, she suggested that she be promoted temporarily to a GM–15 if she were to head the task force. Second, she proposed that she report to Dr. Fiori rather than Mr. Mahoney.

The plaintiff testified that Dr. Fiori was angered by her proposal of a temporary promotion. The offer to head the task force was withdrawn and given to another employee. Mrs. Coleman–Santucci was named as an advisor to the project, but the task force never came to fruition. The plaintiff maintains that Dr. Fiori's reaction to her proposals, and the revocation of the offer illustrate that the defendant sought to prevent the plaintiff from advancement within the agency in reprisal for her earlier lawsuit.

The defendant argues the task force incident was unrelated to the plaintiff's previous actions. The defendant asserts that Mrs. Coleman–Santucci's proposals concerning the project were unrealistic. The project had not been designed as a promotional opportunity. It had been designed as a tool to assist Mr. Mahoney. Therefore, it was necessary that the team leader work directly with Mr. Mahoney. Furthermore, a promotion was not possible because the program was to be phased out in the following months. The defendant maintains that the offer to head the task force was revoked because the plaintiff's concept of the task force differed substantially from the defendant's.

### D. Plaintiff's "Excellent" Performance Rating

In her September 16, 1986 performance evaluation, the plaintiff was graded on four criteria. She received an "Excellent" rating for three criteria and an "Outstanding" for the fourth. When these scores were

totaled, Mrs. Coleman–Santucci received an overall rating of "Excellent".

The plaintiff thought the weightings attributed to the performance criteria were inappropriate. She complained to Mr. Heyob who had made the evaluation. Mr. Heyob indicated that he thought the rating was accurate but told the plaintiff she could seek a higher level review.

Mrs. Coleman–Santucci then met with Dr. Fiori about the evaluation. Dr. Fiori agreed to change the weights attributed to two of the four criteria. The plaintiff's score was doubled in the area of assistance in management of CON and Section 1122 programs; the criteria in which the plaintiff had received an "Outstanding". And in one of the other categories, the plaintiff's score was halved. Consequently, the plaintiff's total score was raised from 322 to 337. Because her total score was still within the range for an "Excellent" rating, the overall evaluation remained the same.

The plaintiff claims that she should have been rated "Outstanding". She claims that the defendant used improper weightings of the performance elements in an effort to retaliate against her.

The defendant points out that the plaintiff signed the performance evaluation in the beginning of the rating period, indicating that she agreed with the weightings of the performance elements. Furthermore, the defendant argues, Dr. Fiori changed the weights upon Mrs. Coleman–Santucci's request and raised the plaintiff's total score. The defendant contends that, in relation to the performance evaluation, the plaintiff has shown no evidence of an intent to retaliate.

### E. Plaintiff's Reassignment to Personneless Branch

By mid–1986, the scheduled phase out of the Office of Health Planning was nearly complete. Instead of undergoing a reduction in force ("RIF"), the agency had attempted to place employees from OHP in other positions throughout the agency. The agency also had encouraged employees to look on their own for open opportunities within the agency. But some employees, including the plaintiff, remained unplaced.

Witnesses for the defendant explained that employees had to be placed in vacant positions; an employee could not take her slot with her and create a new position in another division. As a result, the employees who were at high grade levels such as Mrs. Coleman–Santucci, were difficult to place because few GM–14 slots were open.

Sometime in September, the plaintiff was assigned as Deputy Branch Chief of the Bureau of Health Professions, Health Personnel Standards Branch, Division of Associated Health Professions ("Standards Branch"). Mrs. Coleman–Santucci testified that she was apprehensive about the assignment because the branch had no other employees and little work. However, she spoke with Dr. Thomas Louden, the director of the bureau, and he assured her that he hoped to staff the branch in the near future. Dr. Louden believed that the Health Care Quality Improvements Act, passed in 1986, would create more work and more funding for the division.

Dr. Louden's hopes never materialized. The plaintiff remained the only personnel in the standards branch until the branch was abolished in a division reorganization.

The plaintiff asserts that the defendant purposefully slotted her in the standards branch in order to dead-end her career. She argues that prior to her transfer, the branch had been used for employees seeking earlier retirement. She also points out that several high level positions had been eliminated from the branch, making it necessary for the agency to transfer a slot back to the branch in order to place the plaintiff. The plaintiff argues that the defendant undertook such maneuvers in retaliation against her.

The defendant responds that it was necessary to place the plaintiff somewhere and it had few options. The defendant argues that the plaintiff was not the only employee who was unhappy about the transfer.

### III. Evidentiary Burdens Under Title VII

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

(1973), the Supreme Court established a three-part evidentiary scheme of burden-shifting between the parties to a Title VII action. The plaintiff bears the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination.

 The plaintiff's burden of establishing a *prima facie* case is not onerous. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). In a Title VII discrimination suit alleging reprisal, the plaintiff may establish her *prima facie* case by showing that: 1) she engaged in statutorily protected activity; 2) the employer took an adverse personnel action; and 3) there was a causal connection between the two. *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984).

 If the plaintiff meets this burden, a presumption of unlawful discrimination by the employer is created. The burden shifts to the defendant/employer to rebut the presumption. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. The employer must present evidence that the adverse action against the plaintiff was motivated by legitimate, nondiscriminatory reasons. Essentially, the employer must give a plausible explanation for its actions which rebuts the presumption that it sought to discriminate against its employee. *Id.* at 254–255 & n. 8, 101 S.Ct. at 1094 & n. 8. The defendant bears only a burden of production. *Id.* Where the evidence supports the defendant's explanation as plausible, the defendant need not persuade the Court that its proffered reasons guided its actions against the plaintiff. *Id.*

 If the employer meets its burden, the plaintiff then must show by a preponderance of the evidence that the defendant's explanation is a pretext for discrimination. *Id.* at 253, 101 S.Ct. at 1093–94.

## IV. *Analysis*

This Court finds that the plaintiff has met her burden of persuasion as to the first allegation set forth in the pleadings. The plaintiff has established by a prepon-

derance of the evidence that the defendant unlawfully retaliated against her by failing to promote her to Acting Director of DAOM. As to the remaining allegations, the plaintiff has failed to establish by a preponderance of the evidence that she was the victim of unlawful reprisal.

In the discussion which follows, the Court sets forth in detail the factual basis for these conclusions as to each of the plaintiff's five allegations of reprisal.

### A. Selection of Acting Director of DAOM

 As to the first allegation, the plaintiff has met her burden of establishing a *prima facie* case by showing: that the defendant knew of her prior success in a Title VII discrimination suit against her employer; that she suffered an adverse employment action, namely, the denial of a temporary promotion and loss of management opportunities; and that the evidence supports an inference that the defendant's actions were influenced by its views of the plaintiff's prior protected activity. As to the last point, Mrs. Coleman–Santucci presented evidence that a decision to promote her to an Acting Director position was altered without explanation; and that when the plaintiff sought an explanation, Dr. Fiori made statements which strongly suggested that the defendant was motivated by reprisal. The plaintiff also showed that the defendant's actions deviated from its normal practice and treatment of other employees.

 However, a finding that the plaintiff has established a *prima facie* case of reprisal does not relieve her of the burden of proving by a preponderance of the evidence that the defendant intentionally discriminated against her. *Mitchell v. Baldrige,* 759 F.2d 80, 87 (D.C.Cir.1985). Ultimately, "the plaintiff retains the burden of persuasion" on the final question of whether the defendant committed illegal acts of reprisal against the defendant. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. If the defendant fails to rebut the presumption of reprisal created by the plaintiff's *prima facie* showing, then the plaintiff's burden of per-

suasion is met. *Id.* at 254, 101 S.Ct. at 1094. However, if the defendant provides a legitimate, nondiscriminatory explanation for its actions, the plaintiff must show that the proffered explanation is pretextual to succeed on the merits. *Id.* at 256, 101 S.Ct. at 1095; *See also Mitchell,* 759 F.2d at 87. "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

 The defendant, here, has succeeded in rebutting the presumption of reprisal by providing a legitimate, nondiscriminatory explanation for its nonselection of the plaintiff for the Acting Director position. Dr. Fiori, who had sole responsibility for the final decision, testified that her reasons for selecting Mr. Heyob over Mrs. Coleman–Santucci were twofold. First, the program was undergoing a very stressful period in its history. At the time the selection was made, the future of the program was uncertain. Based on the information available to her, Dr. Fiori concluded that selection of the plaintiff for the Acting Director slot during this crucial period would be too disruptive. Second, Dr. Fiori stated that in selecting an Acting Director she was trying to guard against the charge of preselection of the permanent Director. Dr. Donald Parks, the executive officer in charge of personnel matters, recommended that Dr. Fiori select Mr. Heyob. Mr. Heyob was ineligible for the permanent directorship as it did not involve a promotion for him; therefore, no charge of preselection could be made. In addition, Mr. Heyob had experience in the program and had good relationships with the employees in the division.

 The plaintiff, however, has succeeded in discrediting the defendant's explanation as a mere pretext for reprisal. Dr. Fiori was solely responsible for the final selection of the Acting Director. She had indicated to Mrs. Coleman–Santucci several weeks prior to Mr. Belin's retirement that, as Deputy Director, she would be selected

for the position. The customary practice in the agency was for the Deputy Director to assume the Acting Director's role until a permanent Director was chosen. When Mr. Heyob was chosen as Acting Director instead of her, Mrs. Coleman–Santucci was naturally quite surprised. She went to Dr. Fiori for an explanation. Dr. Fiori explained that she had had confidential discussions with Mr. Belin and Mr. Heyob which had influenced her decision. Then, Dr. Fiori exclaimed "Liz, why did you want to come back to planning? Didn't you know they'd be out to get you?"

Dr. Fiori's comments reveal that the defendant's true motive was reprisal against the plaintiff for her earlier success in a discrimination suit against the agency. Dr. Fiori had intended to follow the agency's customary practice and make Mrs. Coleman–Santucci the Acting Director. She told the plaintiff as much shortly after Mr. Belin announced his retirement. It was only after a meeting with Mr. Belin and Mr. Heyob, both of whom were well aware of the plaintiff's earlier lawsuit, that Dr. Fiori abruptly changed her mind.

Dr. Fiori contends that at the meeting with Mr. Belin and Mr. Heyob she was made aware of objections to the plaintiff's selection. Both Mr. Belin and Mr. Heyob were opposed to placing the plaintiff in the Acting Director's position because the plaintiff's poor management skills would create more stress in an already stress-filled office. Mr. Belin told Dr. Fiori that "under no circumstances" should she select the plaintiff.

The criticisms against the plaintiff must be viewed in light of the defendant's discriminatory animus towards the plaintiff. The defendant asserts that Mrs. Coleman–Santucci was disruptive and could not work well with other employees. The defendant argues it would have been stressful to place the plaintiff in the position of Acting Director, particularly if the program was to be phased out of existence. Yet, a number of the plaintiff's co-workers testified on her behalf that they found her professional and pleasant to work with. Several of these witnesses had worked closely with the

plaintiff on projects which required high levels of cooperation.

Other criticisms leveled at the plaintiff were "that she was disorganized, that she made excessive requests to have material rewritten, and that she did not easily accept decisions that were based on opinions that she did not share." (Defendant's Proposed Findings of Fact and Conclusions of Law, at 7–8). However, the Court finds that Mrs. Coleman–Santucci's work on the Section 1122 and CON programs was technical and intricate. It required careful drafting of materials and numerous revisions. As the expert on these programs, Mrs. Coleman–Santucci had a responsibility to assert her opinion when she found others in error.

The Court believes that many of the problems alleged by the defendant were caused by the fact that the plaintiff had no secretary to assist her. Given the nature of the plaintiff's work, the Court finds it inexcusable that the defendant did not provide the plaintiff with her own secretary. The Court does not doubt that difficulties sometimes arose between the plaintiff and other personnel when the plaintiff continually was forced to borrow secretarial help from other offices.

The Court further finds that the defendant's explanation that Mr. Heyob was selected as Acting Director rather than Mrs. Coleman–Santucci to avoid an appearance of preselection, is also pretextual. When the issue of who would replace Mr. Belin first arose, Dr. Fiori told the plaintiff that she would be awarded the Acting Director position as was customary. Dr. Fiori must have known at that point, that Mrs. Coleman–Santucci was eligible and likely to compete for the permanent director slot; yet, the charge of preselection apparently did not concern her. Only after Dr. Fiori's conversation with Mr. Belin and Mr. Heyob was the concern of preselection raised.

Moreover, the plaintiff established that the agency's normal practice was to place the deputy director in the acting director position while a new director was being chosen. In some instances, the deputy director was later chosen as the permanent director. Preselection was not an issue.

Thus, the evidence supports this Court's conclusion that the defendant's preselection explanation for withholding the Acting Director position from the plaintiff is a pretext for reprisal. The evidence suggests that the defendant's concern over preselection was manufactured as an excuse for not selecting Mrs. Coleman–Santucci, after that decision was made. Accordingly, the Court finds that the plaintiff has established that the defendant acted in reprisal against her when the defendant failed to select Mrs. Coleman–Santucci as Acting Director of DAOM.

 However, the Court further finds that the plaintiff is not entitled to monetary damages. The evidence does not support the plaintiff's contention that a temporary promotion to a GM–15 would have accompanied the Acting Director's position. Shortly after the selection of the Acting Director was made, Dr. Fiori learned that the position of Director would not be filled on a permanent basis because the program was to be phased out. At the same time, the agency was undergoing fiscal crisis. Even if the plaintiff had been selected as Acting Director, a temporary promotion would have been unlikely under the circumstances.

Nor does the plaintiff substantiate her claim that if she had been selected Acting Director of DAOM, she would have progressed in her career and been promoted permanently to a GM–15. There is no evidence that the defendant's action denied the plaintiff future promotional opportunities. Therefore, the Court concludes that the plaintiff has not shown she was entitled to a promotion.

### B. Section 1122 Task Force Group Award

 The plaintiff has failed to establish even a *prima facie* case of retaliation as to her allegation that she was discriminated against when the Section 1122 Task Force, which she chaired, was denied a group award. The plaintiff has failed to prove any causal connection between the denial

of the group award and her participation in the earlier discrimination suit. She alleges merely that she was member of the group that was denied an award. That fact alone cannot establish a sufficient nexus between the denial of the award and the plaintiff's prior protected activity.

Nevertheless, at trial, the defendant presented evidence to rebut the charge of reprisal as to this allegation. Therefore, this Court shall consider whether, in light of all the evidence, the plaintiff has established an unlawful retaliation by the defendant.

The defendant's evidence establishes that the Section 1122 Task Force, which the plaintiff chaired, was nominated for a group award by Mr. Belin and that the nomination was approved by Dr. Fiori, as well as Dr. Whiteside. The defendant's evidence further establishes that the nomination was sent to an independent Awards Committee, which reviewed the nominees and scored them anonymously. The Awards Committee chairman and the executive secretary to the Committee at the time the Section 1122 Task Force was nominated both testified that the Awards Board operated under strict bylaws and no discussion of individual group members was permitted. The chairman testified that at the Committee meeting where the plaintiff's group was considered, there was no discussion of Mrs. Coleman–Santucci.

The plaintiff's claim that the Section 1122 Task Force was denied an award in retaliation against her rests on pure speculation. The plaintiff presented no evidence to show a retaliatory motive was involved. Thus, the Court denies the plaintiff's claim for relief as to this allegation.

**C. Interdivisional Team**

■ Similarly, the plaintiff's evidence does not support her contention that the defendant's decision not to make her the team leader of an interdivisional team project was motivated by reprisal. The plaintiff contends that the defendant withdrew the offer to make her team leader in retaliation for the plaintiff's request that she be given a temporary promotion along

with the position. She argues that she was eligible for such a promotion. However, to say that the plaintiff was eligible for a promotion, is not to say that one was due and owing, and therefore, wrongfully denied to the plaintiff.

Dr. Fiori testified that while the project would have given the plaintiff increased leadership opportunities, it was not intended as a promotional opportunity. The plaintiff's request for a promotion was unrealistic in light of the fact that the program was scheduled to be phased out shortly.

Moreover, the plaintiff's request that she report directly to Dr. Fiori rather that Mr. Mahoney illustrated that her conception of the project was different from the defendant's. The interdivisional team, as conceived by Mr. Mahoney and Dr. Fiori, was intended to be primarily an informational tool for Mr. Mahoney. Close contact between the team leader and Mr. Mahoney was necessary for the project's success.

The plaintiff points out that the recommendations she made regarding the interdivisional team were not conditions precedent to her acceptance of the team leader position. Nonetheless, they were legitimate reasons for the defendant to reconsider its offer to make the plaintiff the team leader. The plaintiff failed to show that these reasons were pretextual.

**D. Plaintiff's "Excellent" Performance Rating**

■ The evidence does not support the plaintiff's allegation of retaliation in her September 16, 1986 performance evaluation of "Excellent". As the defendant indicates, the plaintiff signed the evaluation form, indicating her agreement in the beginning of the rating period with the weights attributed to the performance criteria. Nevertheless, the defendant changed these weights when the plaintiff complained, and raised the plaintiff's total score. Moreover, the plaintiff had received a number of performance evaluations since her initial lawsuit against the agency; with the exception of one "Outstanding" rating, these all had been ratings of "Excellent".

The plaintiff has failed to prove the defendant was motivated by reprisal in making this particular evaluation of "Excellent".

### E. Plaintiff's Reassignment to Employeeless Branch

At trial, the plaintiff established a *prima facie* case of retaliation in showing that she was reassigned to the Standards Branch, a branch with no staff and no program mandate, when the OHP was abolished in 1986. The reassignment was adverse to the plaintiff because she maintained her status as a manager, but had no staff to manage. Moreover, the evidence supports Mrs. Coleman–Santucci's contention that the assignment would be less likely to lead to career advancements. The fact that Mrs. Coleman–Santucci was the only employee of OHP reassigned to a branch without personnel illustrates a causal connection between the plaintiff's prior protected activity and the reassignment.

However, the agency explained that reassignment of Mrs. Coleman–Santucci was necessary to complete the phase out of the Office of Health Planning. The plaintiff was one of a small group of employees from the OHP left when the office was eliminated. Because the agency had chosen to reassign all the employees from this office, rather than institute a more drastic RIF, it had to find vacancies in other divisions at each employee's grade level. The defendant presented evidence that few slots at the plaintiff's GM–14 level were open. The defendant also presented evidence that at the time of Mrs. Coleman–Santucci's transfer, the bureau director believed that the Standards Branch would receive new funding and assignments under the newly enacted Health Care Quality Improvements Act. In addition, Dr. Fiori testified that the plaintiff was not the only employee of OHP who was upset about the reassignments. Dr. Fiori felt that she and others had been disadvantaged by the transfer.

The plaintiff has failed to produce sufficient evidence to rebut the defendant's explanation of the transfer. Although the plaintiff argues that she was one of the few employees who had to carry her slot with her during the transfer, this evidence also supports the defendant's contention that Mrs. Coleman–Santucci was difficult to place because of her high grade level. The whole agency was in turmoil, undergoing substantial cut backs. It appears the defendant was attempting to salvage as many jobs as possible. While the Court considers the defendant's actions in placing a management level employee in a position with no staff and little productive work to be wasteful and unfortunate, it does not find that the defendant acted in reprisal against Mrs. Coleman–Santucci.

The Court concludes by noting that this case is another unhappy example that litigation is not a panacea. Many of the problems suffered by Mrs. Coleman–Santucci were the product of a stressful situation made worse by a lack of cooperation and openness between employee and supervisor. The Court cannot cure such problems. The Court hopes that the parties will work together to develop a productive relationship for the future.

For the reasons set forth above, this Court concludes that the plaintiff has proven her first allegation of reprisal. The plaintiff has shown that the defendant discriminated against her in failing to name her Acting Director of DAOM in 1986. As to the plaintiff's remaining allegations, the Court concludes that the defendant did not act in reprisal against the plaintiff. The Court further concludes that the plaintiff is not entitled to monetary relief. Accordingly, this action is dismissed.